## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KATIE GATTO, Individually and as Administratix of the Estate of Nina Gatto,** | : | **CIVIL ACTION NO. 3:20-CV-1684** |
| | : | |
| | : | **(Judge Conner)** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **LACKAWANNA COUNTY, *et al.,*** | : | |
| | : | |
| **Defendants** | : | |

### MEMORANDUM

Plaintiff Katie Gatto ("plaintiff") brings an eight-count complaint against numerous law enforcement officers and several municipal entities in Lackawanna County due to the death of her daughter, Nina Gatto ("Gatto"). Plaintiff brings five claims pursuant to 42 U.S.C. § 1983; a claim for conspiracy under 42 U.S.C. §§ 1983, 1985, 1986; and wrongful death and survival claims under state law, see 42 PA. CONS. STAT. §§ 8301, 8302. All defendants move to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). Several defendants also move to strike certain portions of the complaint under Rule 12(f). We will grant in part and deny in part these motions.

## I.   Factual Background & Procedural History

According to the complaint, Gatto was a young woman who carried a diagnosis of Dissociative Identity Disorder. (See Doc. 1 ¶ 18). This disorder rendered Gatto "incapable of receiving and evaluating information effectively" and incapacitated her. (See id. ¶¶ 19, 26). In 2015, her mother successfully petitioned the Lackawanna County Court of Common Pleas for appointment as Gatto's

guardian.  (See id. ¶¶ 20-28).  The court granted plaintiff guardianship over Gatto, finding that Gatto's disorder left her "incapable of making and communicating decisions concerning management of her financial affairs and to meet essential requirements for her health and safety."  (Id. ¶ 28).

Several years after plaintiff became Gatto's guardian, Gatto was arrested by some of the named defendants.  (See id. ¶¶ 72-73).  Detectives John Munley, Harold Zech, and Corey Condrad work for the Lackawanna County District Attorney's Office ("LCDAO") under the supervision of District Attorney Mark Powell ("D.A. Powell") and Chief Detective Joseph Jordan ("Chief Jordan").  (See id. ¶¶ 8-13). Detective Condrad also worked for Dunmore Borough.  (See id. ¶ 14).  On January 4, 2018, Detectives Munley, Zech, and Condrad arrested Gatto in connection with a sale of heroin and sought Gatto's cooperation as an informant.  (See id. ¶¶ 73-74). According to the complaint, Gatto informed them that she was a drug user, that she was severely mentally ill, and that her mother was her legal guardian.  (See id. ¶¶ 75-76).  Despite being provided this information, the detectives offered, and Gatto signed, a "memorandum of consent" to allow the detectives to record her phone calls and conversations.  (See id. ¶¶ 74, 79, 80).  Detective Zech also executed an "officer's memorandum" averring that Gatto freely and voluntarily consented to these actions, and a "memorandum of approval" was also executed.  (See id. ¶ 87).

Detectives then set up a "buy-bust" by having Gatto call an individual she knew as "Hot," also known as Wayne Douglas, and his girlfriend Mylanie Strickland.  (See id. ¶¶ 88-90).  As soon as Gatto purchased the heroin from Douglas, detectives arrested both him and Strickland.  (See id. ¶ 91).  Over the next several

2

weeks, Gatto and Detective Zech exchanged text messages regarding Hot's arrest, the charges against Gatto (most of which were soon dropped), and Gatto's fear of being exposed as a confidential informant.  (See id. ¶¶ 103-137).  According to the allegations of the complaint, Gatto repeatedly expressed fear that Douglas and Strickland would learn that she worked with the police, and she provided further detail on her mental health history as well as her mother's role as her guardian. (See id.)  She also communicated with Detectives Munley, Zech, and Condrad about further participation as an informant in exchange for money.  (See id. ¶¶ 159-161).

On February 14, 2018, Gatto agreed to act as a confidential informant for another buy, this time in exchange for $100.  (See id. ¶¶ 162-169).  The buy was to occur from an individual Gatto knew as "Tyrek," and whom the detectives knew (or, according to the complaint, should have known) was Cornelius Mapson.  (See id. ¶¶ 171-172, 176).  The complaint alleges that all of the Lackawanna defendants knew who Mapson was, and that he had an extensive and violent criminal history at the time.  (See id. ¶¶ 140-157).  In preparing for the buy, Gatto again signed a memorandum of consent, Detective Condrad signed an officer's memorandum, and D.A. Powell's designee signed a memorandum of approval.  (See id. ¶¶ 182-83).

On February 20, 2018, Gatto texted Mapson to purchase drugs and soon met up with him in his car in Scranton to make the buy.  (See id. ¶¶ 168, 169, 188-189). Mapson apparently "became very paranoid and nervous," checked Gatto for a wire, and asked her where she lived and if she had been followed.  (See id. ¶¶ 190-192). As soon as Gatto exited the vehicle and Mapson drove off, the detectives stopped

Mapson's car and arrested him. (See id. ¶¶ 189, 194-97). Mapson posted bail the following day. (See id. ¶¶ 199-200).

According to the complaint, Mapson and his girlfriend Mindy Palermo began planning to kill Gatto for her role in Mapson's buy-bust arrest. (See id. ¶ 202). Within a week of Mapson's arrest, strangers began to knock on Gatto's door and speak with her, as well as approach her outside the home. (See id. ¶¶ 203-208). Gatto contacted the Scranton police in early March 2018 and purportedly informed them she believed she "was being stalked because of her role as an informant." (See id. ¶ 209). The officers who spoke with Gatto, identified in the complaint as Officers John/Jane Doe I-IV, did not take any action to notify Detectives Munley, Zech, or Condrad about Gatto's concerns regarding her work as a confidential informant, or take any other steps to investigate further. (See id. ¶¶ 210-217). These incidents continued, with strangers showing up at Gatto's house and knocking on Gatto's door. (See id. ¶¶ 218-219). On March 6, Mapson himself drove by Gatto's apartment and stuck his head out of the vehicle's window. (See id. ¶ 206). Gatto allegedly informed defendants that she was being threatened and feared for her life. (See id. ¶ 221).

One of the strangers who knocked on Gatto's door was Kevin Weeks, Mapson's drug associate. (See id. ¶¶ 238-239). Weeks befriended Gatto and began a romantic relationship with her. (See id. ¶ 240). Weeks also provided Gatto drugs. (See id.) At the same time, Weeks coordinated with Mapson and Palermo to use drugs to kill Gatto, through either mixing battery acid with heroin, or giving her an

4

overdose of fentanyl or heroin.  (See id. ¶¶ 241-246).  When these drug-related plans did not succeed, Mapson allegedly decided to kill Gatto himself.  (See id. ¶ 247).

On April 19, 2018, Gatto was contacted by alarm company ADT about a break-in at her apartment.  (See id. ¶ 220).  Police were again contacted, and Scranton Police Officers Gerry Tallo, Eric Jordan, and John/Jane Doe I-IV responded to Gatto's apartment.  (See id. ¶ 222).  Gatto and her mother allegedly advised the officers of Gatto's informant work and repeated their belief that this break-in was connected.  Yet, according to the complaint, the officers did not investigate further.  (See id. ¶¶ 223-231).  Just a few hours later—after  midnight on April 20, 2018—Mapson killed Gatto.  (See id. ¶ 250).  Weeks unlocked Gatto's apartment door from the inside, and Palermo first entered and spoke with Gatto. (See id. ¶ 248).  Mapson then entered the apartment and strangled Gatto by placing a bag over her head and using a sock and a scarf.  (See id. ¶ 251).

Following Gatto's death, no one investigated the conduct of Detectives Munley, Zech, or Condrad regarding their handling of Gatto as a confidential informant.  (See id. ¶ 258).  Detectives Munley, Zech, and Condrad did not report to anyone about their contact with Gatto in the months leading up to her death, and they did not provide their cell phones for safekeeping to secure  cell phone content about Gatto's death.  (See id. ¶¶ 256, 259).  Nor did Lackawanna County, LCDAO, or D.A. Powell conduct an internal review of Gatto's work with the detectives or the LCDAO, or institute any discipline, training, or other remedial action.  (See id. ¶¶ 259-262).  Moreover, plaintiff avers that Lackawanna County, the LCDAO, and D.A.

Powell had a conflict of interest in the prosecution of Mapson, but undertook his prosecution anyway.  (<u>See</u> <u>id.</u> ¶¶ 255, 266).

Gatto's mother instituted this suit in September 2020 alleging eight counts total: five claims pursuant to 42 U.S.C. § 1983; a claim for conspiracy under 42 U.S.C. §§ 1983, 1985, and 1986; and wrongful-death and survival claims under state law, <u>see</u> 42 Pa. Cons. Stat. §§ 8301, 8302.  Named defendants are Lackawanna County, LCDAO, the City of Scranton, Dunmore Borough, D.A. Powell, Chief Jordan, Detective Condrad, Detective Munley, Detective Zech, Officer Tallo, Officer Jordan, and Officers John/Jane Doe I-IV.  (<u>See</u> Doc. 1 at 1-2).  The individual defendants are sued in both their official and personal capacities.  (<u>Id.</u> ¶¶ 8-15).  All defendants have moved to dismiss certain counts of the complaint under Rule 12(b)(6).  These motions are now ripe for consideration.

## II.  <u>**Legal Standard**</u>

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted.  Fed. R. Civ. P. 12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 233 (3d Cir. 2008) (quoting <u>Pinker v. Roche Holdings, Ltd.</u>, 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests."

Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly,

550 U.S. 544, 555 (2007)).  To test the sufficiency of the complaint, the court conducts

a three-step inquiry.  See Santiago v. Warminster Township, 629 F.3d 121, 130-31

(3d Cir. 2010).  In the first step, "the court must 'tak[e] note of the elements a

plaintiff must plead to state a claim.'"  Id. at 130 (alteration in original) (quoting

Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Next, the factual and legal elements of a

claim must be separated; well-pleaded facts are accepted as true, while mere legal

conclusions may be disregarded.  Id. at 131-32; see Fowler v. UPMC Shadyside, 578

F.3d 203, 210-11 (3d Cir. 2009).  Once the court isolates the well-pleaded factual

allegations, it must determine whether they are sufficient to show a "plausible claim

for relief."  Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550

U.S. at 556.  A claim is facially plausible when the plaintiff pleads facts "that allow[]

the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  Iqbal, 556 U.S. at 678.

## III.    **Discussion**

We address a number of threshold issues before turning to the disputed

aspects of defendants' motions.  First, with plaintiff's concurrence, we will dismiss

all claims against D.A. Powell, Chief Jordan, and Detectives Munley and Zech in

their official capacities, as those claims are duplicative of claims against

Lackawanna County.  (See Doc. 38 at 33-34; Doc. 48 at 42).  Second, we will dismiss

plaintiff's claims against LCDAO, as we agree with LCDAO's unopposed argument

that, since it is merely a subdivision or department of Lackawanna County, claims

against it are likewise duplicative of claims against that entity.  (See Doc. 38 at 33;

Doc. 50 at 13); <u>see also</u> <u>Sorrells v. Phila. Police Dep't</u>, 652 F. App'x 81, 82 (3d Cir.

2016) (nonprecedential) (citing <u>Bonenberger v. Plymouth Township</u>, 132 F.3d 20, 25

n.4 (3d Cir. 1997)).  Finally, while the complaint names "Dunmore Borough" as a

defendant and notes that it employed Detective Condrad, (<u>see</u> Doc. 1 ¶¶ 7, 13),

Dunmore Borough correctly notes that the complaint is devoid of any additional

factual allegations against it, and plaintiff has not asserted a <u>Monell</u> claim against it.

(<u>See</u> Doc. 41 at 17-18; Doc. 51 at 7).  Counts VI, VII, and VIII, which are alleged

against "all defendants" therefore fail against Dunmore Borough for lack of factual

support.

### A.    Section 1983 Claims

Section 1983 of Title 42 of the United States Code creates a private cause of

action to redress constitutional wrongs committed by state officials.  <u>See</u> 42 U.S.C.

§ 1983.  The statute is not a source of substantive rights, but serves as a mechanism

for vindicating rights otherwise protected by federal law.  <u>Gonzaga Univ. v. Doe</u>, 536

U.S. 273, 284-85 (2002); <u>Kneipp v. Tedder</u>, 95 F.3d 1199, 1204 (3d Cir. 1996).  To state

a claim under Section 1983, plaintiffs must show a deprivation of a "right secured

by the Constitution and the laws of the United States . . . by a person acting under

color of state law."  <u>Kneipp</u>, 95 F.3d at 1204 (quoting <u>Mark v. Borough of Hatboro</u>,

51 F.3d 1137, 1141 (3d Cir. 1995)).  Defendants do not dispute that they were state

actors at all times relevant herein.[1]  We must therefore determine whether their

conduct deprived Gatto of rights secured by the United States Constitution.

 Plaintiff bases the Section 1983 claims in Counts I though VI on alleged

violations of the substantive due process protections of the Fourteenth

Amendment.  The "substantive component of due process . . . protects individual

liberty against certain government actions regardless of the fairness of the

procedures used to implement them." Nicini v. Morra, 212 F.3d 798, 806 (3d Cir.

2000) (internal citation and quotation marks omitted).  Although the Due Process

Clause limits the state's power to act, it does not place an affirmative obligation

upon it to do so. DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189,

195-96 (1989) (holding the Due Process Clause "confers no affirmative right to

governmental aid, even where such aid may be necessary to secure life, liberty, or

property interests of which the government itself may not deprive the individual").

However, the Third Circuit recognizes two exceptions to this general rule: the

"special relationship" and the "state-created danger" exceptions. See Ye v. United

States, 484 F.3d 634, 637 (3d Cir. 2007); Morse v. Lower Merion Sch. Dist., 132 F.3d

902, 907 (3d Cir. 1997).

---

[1] Plaintiff has not responded to defense arguments that the Fifth Amendment is not relevant to her claims because none of the defendants are *federal* actors, (see Doc. 41 at 6; Doc. 51 at 5 n.1).  We agree that the Fifth Amendment provides a mechanism for relief from due process violations through the actions of federal governmental actors.  See Citizens for Health v. Leavitt, 428 F.3d 167, 178 n.11 (3d Cir. 2005).  To the extent the complaint asserts claims under the Fifth Amendment's Due Process Clause, those claims are dismissed.

Counts II, III, and V raise claims against various individual defendants under the special-relationship and state-created danger theories.  Counts I and IV assert violations for which Lackawanna County, D.A. Powell, and the City of Scranton are potentially responsible pursuant to the Monell theory of municipal liability.  Count VI alleges a civil conspiracy against all defendants under Sections 1983, 1985, and 1986.  The court will address these claims and the asserted defenses *seriatim*.

### 1.    *Special-Relationship Theory*

Plaintiff brings claims under Section 1983 based on a "failure to protect" theory against individual Lackawanna defendants D.A. Powell, Detectives Munley, Zech, and Condrad, and Chief Jordan in Count II, as well as Scranton defendants Officer Jordan, Officer Tallo, and Officers John/Jane Doe I-IV in Count V.  (See Doc. 1 ¶¶ 282-289; 311-317; Doc. 48 at 15).  The "special-relationship" theory recognizes that in circumstances where the state imposes limits upon an individual's "freedom to act on his own behalf," that deprivation of liberty triggers a corresponding duty under the Due Process Clause.  See DeShaney, 489 U.S. at 200.  It is only when the state "so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety"—that a due process violation occurs.  Id.  Therefore, only in limited circumstances associated with "incarceration, institutionalization, or other similar restraint of personal liberty"

will the Due Process Clause "impose[ ] upon the State affirmative duties of care and
protection with respect to certain individuals."  Id. at 198, 200.

Plaintiff fails to show that a special relationship existed between Gatto and
any of the defendants because she has not alleged that an ongoing custodial or
similar relationship existed.  Gatto was neither incarcerated nor institutionalized at
the time of her murder.  Nor did any of the defendants restrain Gatto's liberty in
any other manner that would give rise to the DeShaney special relationship.
Plaintiff argues that a special relationship existed because defendants promised to
protect Gatto, and that their failures to follow through on said promise resulted in
her murder.  (See Doc. 48 at 16-17).  This argument ignores DeShaney's admonition
that the affirmative duty to protect does *not* arise from any "expressions of intent to
help" the injured party, "but from the limitation which it has imposed on [her]
freedom to act on [her] own behalf."  See DeShaney, 489 U.S. at 200.

According to the complaint, Gatto was only arrested and taken into custody a
single time by detectives Munley, Zech, and Condrad in January 2018, prior to her
first act as a confidential informant in the arrest of Wayne "Hot" Douglas.  (See Doc.
1 ¶¶ 71-96).  The complaint does not aver Gatto was in custody a second time, and in
fact concedes that "had the defendants ended efforts to utilize her as an informant"
after the Douglas bust in January, she "would not have died."  (Id. ¶ 96).  Gatto's
interactions with the Scranton defendants are even further attenuated.  These
officers responded to the ADT security call on April 19, 2018, but allegedly failed to
properly investigate.  (See id. ¶¶ 222-230).  Neither Supreme Court nor Third Circuit
caselaw allows a claim against the Scranton officers for failing to act to prevent

Gatto's murder.  See Burella v. City of Philadelphia, 501 F.3d 134, 140-41 (3d Cir. 2007) (citing DeShaney, 489 U.S. at 195) (officers' failure to intervene in repeated domestic violence disputes insufficient to state a substantive due process claim).

Plaintiff's claims based on a "special relationship" or "failure to protect" theory fail as a matter of law.  Moreover, because plaintiff's theories of liability in these counts are legally rather than factually deficient, leave to amend would be futile.  See Alston v. Parker, 363 F.3d 229, 236 (3d Cir. 2004).  We will thus dismiss Counts II and V of the complaint with prejudice.

### 2.   *State-Created Danger Theory*

When the affirmative exercise of state authority either causes injury to a citizen or leaves a citizen more vulnerable to injury at the hands of a third party, the government contravenes the substantive due process protections of the Fourteenth Amendment.  See Bright v. Westmoreland County, 443 F.3d 276, 281 (3d Cir. 2006) (quoting Schieber v. City of Philadelphia, 320 F.3d 409, 416 (3d Cir. 2003)).  This principle of liability is commonly referred to as the "state-created danger" theory. See id.  To establish a state-created danger claim, a plaintiff must allege four elements: (1) the resulting injury "was foreseeable and fairly direct," (2) the state actor acted "with a degree of culpability that shocks the conscience,"[2] (3) there was

---

[2] Our court of appeals applies different levels of culpability for "behavior to shock the conscience."  L.R., 836 F.3d at 246.  But "where deliberation is possible and officials have the time to make 'unhurried judgments,' deliberate indifference is sufficient."  Id.  Deliberate indifference requires "a "conscious disregard of a substantial risk of serious harm."  Id. (citation omitted).  Plaintiff alleges that these decisions took place over a period of time in which defendants had time to make "unhurried judgments."  (See Doc. 1 ¶ 297).  We therefore apply the deliberate indifference standard.

some relationship between the state and the plaintiff "such that the plaintiff was a foreseeable victim" or was a "member of a discrete class," and (4) the state actor used his authority to create an opportunity for danger that otherwise would not have existed.  See L.R. v. Sch. Dist. of Phila., 836 F.3d 235, 242 (3d Cir. 2016) (citing Bright, 443 F.3d at 281).  With respect to the fourth element, liability is "predicated upon the states' *affirmative acts* which work to the plaintiffs' detriment[ ] in terms of exposure to danger."  Bright, 443 F.3d at 282 (quoting D.R. by L.R. v. Middle Bucks Area Vocational Tech. Sch., 972 F.2d 1364, 1374 (3d Cir. 1992)).

Plaintiff alleges a violation of Gatto's substantive due process rights based on a state-created danger theory against D.A. Powell; Detectives Munley, Zech, and Condrad; and Chief Jordan.  (See Doc. 1 ¶¶ 290-301).  The complaint alleges the following facts:  During her arrest in January 2018, Gatto informed Detectives Munley, Zech, and Condrad that she was severely mentally ill "and that her mother was her legal guardian."  (See id. ¶ 76).  In spite of this information, the detectives proceeded to execute a buy-bust with Gatto's assistance, disregarding the incapacitation information Gatto had just communicated, and even though they knew Gatto was incapable of consenting to act as an informant.  (See id. ¶¶ 77-88).  After the January buy-bust, Gatto continually reached out to Detective Zech with additional information about her mental illness and incapacitation, and this information was shared with Detectives Munley and Condrad.  (See id. ¶¶ 98, 132-138).  The detectives responded by offering Gatto money for more work as an informant.  (See id. ¶¶ 160-161).  When planning the Mapson buy-bust, they executed memoranda concerning Gatto's consent after they had been repeatedly

informed by Gatto that she was legally incapacitated and that her mother acted as her legal guardian. (See id. ¶¶ 177-187). Even though Mapson became "paranoid and nervous" during the buy, and searched Gatto for a wire, the detectives moved to arrest him "immediately after" Gatto exited his vehicle. (See id. ¶¶ 190-194). They took these actions despite their knowledge of Mapson's extensive and violent criminal history. (See id. ¶¶ 139-157, 171-174).

Assuming these facts as true, Plaintiff has adequately pled the elements for a state-created danger theory against Detectives Zech, Munley, and Condrad. By offering money to Gatto and placing her in a buy-bust setup with Mapson, the detectives took affirmative action which "created or increased the risk of danger" to Gatto. See L.R., 836 F.3d at 242. The complaint also alleges the detectives were aware of Mapson's criminal history and Gatto's incapacitation well before the buy, making the danger to Gatto that would result from arresting Mapson "immediately after" she exited his vehicle "foreseeable and fairly direct." See id. at 245. Given the detectives' purported knowledge, the complaint sufficiently alleges that they acted with deliberate indifference to the dangers inherent in using a legally incapacitated person as an informant and exposing her identity to someone they knew was violent. See id. at 246 (citing Vargas v. City of Philadelphia, 783 F.3d 962, 973-74 (3d Cir. 2015) (deliberate indifference requires "conscious disregard of a substantial risk of serious harm")). Finally, a relationship existed between Gatto and the detectives due to her status as a confidential informant. The government's interest in keeping the identity of informants confidential encourages "citizens to communicate their knowledge" of criminal activity, see Roviaro v. United States,

353 U.S. 53, 59 (1957), and the harm from the state's exposure of their identities makes them members of a discrete class of persons subject to potential harm brought about by such exposure, see L.R., 836 F.3d at 242.

The complaint also contains adequate factual support for a supervisory claim against D.A. Powell and Chief Jordan.  Supervisory liability can attach through the supervisor's actions as a policymaker, or if the individuals "had knowledge of and acquiesced in their subordinates' violations."  See Parkell v. Danberg, 833 F.3d 313, 330 (3d Cir. 2016) (citation omitted).  The complaint alleges that Detectives Munley, Zech, and Condrad worked at D.A. Powell's and Chief Jordan's direction.  (See Doc. 1 ¶¶ 8-12, 43, 45, 46, 48, 54-56).  It further alleges that D.A. Powell and Chief Jordan "conducted an investigation" into Gatto on January 4, 2018.  (See Id. ¶ 72).  And it alleges that D.A. Powell and Chief Jordan knew Gatto was incapable of consenting to be an informant due to her legal incapacitation.  (See id. ¶¶ 80, 83, 99).  D.A. Powell and Chief Jordan nonetheless purportedly authorized the Mapson buy-bust, despite their previous knowledge of Gatto's incapacitation.  (See id. ¶ 138). Moreover, D.A. Powell and his designee were involved in signing the memorandum of approval regarding Gatto's ability to consent.  (See id. ¶¶ 184-185).  The complaint therefore contains sufficient factual allegations of D.A. Powell's and Chief Jordan's "actual knowledge and acquiescence" to the alleged violations.  See Parkell, 833 F.3d at 331 (citation omitted).

### 3.    *Municipal Liability*

Plaintiff brings a Monell claim against Lackawanna County and D.A. Powell for alleged failure to promulgate and enforce policies, failure to supervise, failure to

train, and failure to provide discipline and remedial measures.  (See Doc. 1 ¶¶ 267-281).  She brings the same claim against the City of Scranton.  (See id. ¶¶ 302-310).

Municipalities and other local government entities are "persons" for purposes of Section 1983 liability.  Monell v. N.Y.C. Dep't of Social Servs., 436 U.S. 658, 690 (1978).  But such entities may not be held liable in a Section 1983 suit for conduct of their employees under a theory of *respondeat superior* liability.  Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997) (citing Monell, 436 U.S. at 692); see Colburn v. Upper Darby Township, 946 F.2d 1017, 1027 (3d Cir. 1991).  Municipal liability only arises when a government causes an employee to violate another's constitutional rights by an official custom or policy.  Monell, 436 U.S. at 690-94; see also Montgomery v. De Simone, 159 F.3d 120, 126 (3d Cir. 1998).  To establish liability under Monell, a plaintiff must identify the challenged policy or custom, demonstrate proper attribution to the public entity, and show a causal link between the execution of the policy or custom and the injury suffered.  See Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 583-84 (3d Cir. 2003).

A policy exists when a decisionmaker possessing final authority to establish public policy with respect to the disputed action issues an official proclamation, policy, or edict.  Id. at 584 (quoting Kneipp, 95 F.3d at 1212).  A custom is an act that is not formally approved but is nonetheless "so widespread as to have the force of law."  Id. (quoting Brown, 520 U.S. at 404).  A plaintiff may also establish municipal liability by demonstrating that a policymaker failed to take affirmative action despite an obvious need to correct the "inadequacy of existing practice [which is] so

likely to result in the violation of constitutional rights" that inaction exhibits "deliberate indifference" to the need.  Id. (quoting Brown, 520 U.S. at 417-18).

A government entity exhibits deliberate indifference when it "disregard[s] a known or obvious consequence of [its] . . . action." Connick v. Thompson, 563 U.S. 51, 61 (2011); see Vargas, 783 F.3d at 974.  Failure to train amounts to deliberate indifference when it causes a pattern of cognate constitutional violations.  See Connick, 563 U.S. at 62; Kelly v. Borough of Carlisle, 622 F.3d 248, 265 (3d Cir. 2010). Alleged training deficiencies must closely relate to the constitutional injury.  City of Canton v. Harris, 489 U.S. 378, 391 (1989).  The failure-to-act theory of liability is governed by the same causation principles.  See Berg v. County of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000).  A single incident may evidence deliberate indifference sufficient to establish Monell liability.  See Thomas v. Cumberland County, 749 F.3d 217, 223 (3d Cir. 2014).  In rare instances, the need for training 'can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights' even without a pattern of constitutional violations." Id. (quotation and citations omitted); Natale, 318 F.3d at 584.

Plaintiff's complaint includes sufficient factual support for a Monell claim against Lackawanna County.  The complaint contains multiple allegations regarding the County's policies, or lack thereof, regarding use of confidential informants and buy-bust operations.  (See Doc. 1 ¶¶ 4, 47, 49, 258-265).  The complaint therefore permits an inference that the Department issued "an official proclamation, policy[,] or edict" permitting its officers to use a legally incapacitated individual like Gatto as a confidential informant in the manner alleged.  See Natale,

318 F.3d at 584. The complaint further states that noncompliance with said policies was prevalent, recurring, or sanctioned by municipal decisionmakers D.A. Powell and Chief Jordan. (<u>See</u> Doc. 1 ¶¶ 46, 50, 54, 55, 62-69). The complaint also directly ties the County's method of use of confidential informants to the alleged constitutional injury suffered by Gatto. (<u>See</u> Doc. 1 ¶¶ 280-281). We therefore conclude the complaint states a plausible <u>Monell</u> claim for relief against Lackawanna County. <u>See</u> <u>Santiago</u>, 629 F.3d at 130.

The <u>Monell</u> claim against the City of Scranton, however, is factually undeveloped. Plaintiff alleges no facts about the City of Scranton other than identifying it as a municipality, (<u>see</u> <u>id.</u> ¶ 5), noting that Officers Jordan, Tallo, and John/Jane Doe I-IV acted under its authority, (<u>see</u> <u>id.</u> ¶¶ 13-15) and reciting the elements of a <u>Monell</u> claim, (<u>see</u> <u>id.</u> ¶¶ 302-310). Unlike the allegations against Lackawanna County, the complaint alleges no facts to identify a particular custom or policy, nor does it allege an obvious need to correct the "inadequacy of existing practice [which is] so likely to result in the violation of constitutional rights" that inaction exhibits "deliberate indifference" that need. <u>See</u> <u>Natale</u>, 318 F.3d at 584. We will therefore dismiss the <u>Monell</u> claim in Count IV against the City of Scranton with leave to amend.

### 4.   *Civil Conspiracy*

Plaintiff brings a claim for conspiracy against all defendants pursuant to Sections 1983, 1985, and 1986, claiming they agreed to violate Gatto's substantive due process rights. (<u>See</u> Doc. 1 ¶¶ 318-321). All defendants move to dismiss this

claim for lack of an alleged agreement or failure to state an underlying civil rights violation.

To state a claim for conspiracy under Section 1983, a plaintiff must allege "that persons acting under color of state law conspired to deprive him of a federally protected right." Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 254 (3d Cir. 1999) (citing Dennis v. Sparks, 449 U.S. 24, 29 (1980); Lake v. Arnold, 112 F.3d 682, 689 (3d Cir. 1997)). To state a claim under Section 1985(3), a plaintiff must allege a conspiracy to deprive a person "equal protection of the laws" or "equal privileges and immunities under the laws" as well as an act to further the conspiracy, and resulting injury from the deprivation of that individual's rights or privileges. Farber v. City of Paterson, 440 F.3d 131, 134 (3d Cir. 2006) (quoting United Bhd. of Carpenters & Joiners v. Scott, 463 U.S. 825, 828-29 (1983)). To state a claim under Section 1986, a plaintiff must allege that a defendant who had both "actual knowledge of" and "power to prevent" a Section 1985 conspiracy refused to prevent the conspiracy, and that a "wrongful act was committed." See Clark v. Clabaugh, 20 F.3d 1290, 1295 (3d Cir. 1994). A plaintiff pleading unconstitutional conspiracy "must assert facts from which a conspiratorial agreement can be inferred." Hollinghead v. City of York, 912 F. Supp. 2d 209, 225 (M.D. Pa. 2012), aff'd, 592 F. App'x 110 (3d Cir. 2015) (quoting D.R., 972 F.2d at 1377). A Section 1986 claim depends on the "preexisting violation of § 1985." Clark, 20 F.3d at 1295.

At this juncture, plaintiff's claim for conspiracy lacks sufficient factual support to infer a conspiratorial agreement. See D.R., 972 F.2d at 1377. Other than the legal conclusions alleged within Count VI, the complaint is devoid of facts

regarding any agreement between the defendants.  As the Scranton defendants

correctly point out, there are no allegations that they and the Lackawanna County

defendants interacted or communicated with each other at all.  (See Doc. 38 at 31).

Furthermore, to the extent the complaint alleges a Section 1985 claim, it fails to

allege a conspiracy "predicated on 'racial, or perhaps otherwise class-based,

invidiously discriminatory animus.'"  See Ridgewood Bd. of Educ., 172 F.3d at 253.

Plaintiff's Section 1986 claim also fails to plead an underlying conspiracy.  See

Clark, 20 F.3d at 1295.  For these reasons, we will dismiss Count VI with leave to

amend.

### 5.   *Qualified Immunity*

D.A. Powell, Chief Jordan, and Detectives Munley, Zech, and Condrad all

assert a defense of qualified immunity.  Qualified immunity protects a state actor

who has committed a constitutional violation if the plaintiff's rights were not

"clearly established" when the individual acted.  Pearson v. Callahan, 555 U.S. 223,

244-45 (2009).  No liability will attach if a reasonable actor could have believed the

challenged conduct was in compliance with settled law.  Id.; see Springer v. Henry,

435 F.3d 268, 280 (3d Cir. 2006).  The burden to establish qualified immunity rests

with the defendant claiming its protection.  Beers-Capitol v. Whetzel, 256 F.3d 120,

142 n.15 (3d Cir. 2001) (citing Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720,

726 (3d Cir. 1989)).

At the Rule 12(b)(6) stage, immunity must be "established on the face of the

complaint."  Thomas v. Independence Township, 463 F.3d 285, 291 (3d Cir. 2006).

Since qualified immunity shields a government official from suit rather than merely

liability, immunity questions should be resolved "at the earliest possible stage in litigation."  Hunter v. Bryant, 502 U.S. 224, 227 (1991) (internal citations and quotation marks omitted).  Nonetheless, our court of appeals has cautioned that "it is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases." See Newland v. Reehorst, 328 F. App'x 788, 791 n.3 (3d Cir. 2009) (nonprecedential).

A court evaluating a claim of  qualified immunity considers a two-pronged inquiry: whether, based on the alleged facts, a constitutional right has been violated and, if so, whether the right was "clearly established" at the time of the alleged violation.  See Spady v. Bethlehem Area Sch. Dist., 800 F.3d 633, 637 (3d Cir. 2015) (quoting Pearson, 555 U.S. at 232).  A court may begin its qualified immunity analysis with either prong.  See Pearson, 555 U.S. at 239.  We have already determined that plaintiff has adequately alleged a constitutional violation by defendants in the form of a state-created danger that resulted in her daughter's death.  See *supra* at 12-15.  We thus turn to defendants' argument that the right purportedly violated was not clearly established.

For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Hope v. Pelzer, 536 U.S. 730, 739 (2002).  Although earlier cases involving "fundamentally similar" facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding.  Id. at 741.  Here, however, plaintiff *has* identified a case involving

fundamentally similar facts: <u>Estate of Lagano v. Bergen County Prosecutor's Office</u>, 769 F.3d 850 (3d Cir. 2014).

Similar to the matter *sub judice*, our court of appeals' decision in <u>Estate of Lagano</u> involved disclosure of a confidential informant's identity that resulted in the informant's murder.  <u>See id.</u> at 858-859.  The district court dismissed the complaint on grounds of qualified immunity, but the Third Circuit vacated the decision, stating: "We cannot endorse the District Court's unduly narrow construction of the right at issue, *or its statement that the right was not clearly established*."  <u>Id.</u> at 859 (emphasis added).  Instead, the court reiterated that "[i]t has been clearly established in this Circuit for nearly two decades that a state-created danger violates due process."  <u>Id.</u> (citing <u>Kneipp</u>, 95 F.3d at 1211).[3]  The court of appeals further explained that our inquiry must focus on the allegations in the complaint, and "whether it would be clear to a reasonable officer" that his actions were unlawful under the circumstances.  <u>See id.</u> (citation omitted).

---

[3] Several cases from other circuits support our conclusion: <u>See e.g.</u>, <u>Irish v. Fowler</u>, 979 F.3d 65, 79 (1st Cir. 2020) (detectives' actions fell within the state-created danger doctrine, as they left a voicemail for a man whom the plaintiff had recently reported to the police for sexually assaulting her, and "effectively alerted the suspect that he was under investigation in a manner that notified the suspect who the reporting individual was, despite knowing that the suspect was likely to become violent toward that person"); <u>Monfils v. Taylor</u>, 165 F.3d 511, 520 (7th Cir. 1998) (holding jury had sufficient evidence to conclude that police officer violated informant's substantive due process rights when officer failed to prevent release of 911 call from informant regarding his coworker, when coworker obtained tape and then murdered informant); <u>Kennedy v. Ridgefield City</u>, 439 F.3d 1055, 1064-65 (9th Cir. 2006) (officer not entitled to qualified immunity at summary judgment, and plaintiff could proceed on state-created danger theory, when officer disclosed plaintiff's molestation accusation against plaintiff's neighbor to said neighbor, who then shot plaintiff and killed her husband).

The complaint alleges that D.A. Powell, Chief Jordan, and Detectives Munley, Zech, and Condrad all knew Gatto was legally incapacitated and under guardianship, yet continued to offer her money in exchange for work as a confidential informant and exposed her identity to Mapson, leading to her murder. At this procedural juncture we must construe the facts alleged in the light most favorable to the plaintiff. Accordingly, we conclude that, based upon the circumstances alleged in the complaint, it would have been clear to these officers that their actions were unlawful. Further consideration of qualified immunity must await development of the factual record. We will therefore deny the motions dismiss the claims against D.A. Powell, Chief Jordan, and Detectives Munley, Zech, and Condrad on the basis of qualified immunity without prejudice to their right to reraise this defense at summary judgment.

**B.      State-Law Claims**

Plaintiff asserts claims against all defendants under Pennsylvania's wrongful-death and survival statutes. See 42 PA. CONS. STAT. §§ 8301, 8302. All defendants move to dismiss these claims, arguing that no underlying constitutional violation exists. These statutes do not create independent causes of action; rather, they are derivative in the sense that the substance of the claim derives from the injury to the decedent. See Pisano v. Extendicare Homes, Inc., 77 A.3d 651, 660 (Pa. Super. Ct. 2013) (quoting Kaczorowski v. Kalkosinski, 184 A. 663, 664 (Pa. 1936)). A wrongful death cause of action exists "only for the benefit of the spouse, children or parents of the deceased" and not for the benefit of the decedent's estate. See 42 PA. CONS. STAT. § 8301(b); Hodge v. Loveland, 690 A.2d 243, 246 (Pa. Super. Ct. 1997) (citations

omitted).  A survival action may be brought by the administrator of a decedent's estate "to recover the loss to the estate of the decedent resulting from the tort."  See Kiser v. Schulte, 648 A.2d 1, 4 (Pa. 1994); see also 42 PA. CONS. STAT. § 8302.

We have dismissed plaintiff's Section 1983 claims against Officer Tallo, Officer Jordan, the City of Scranton, and Dunmore Borough for failure to state a claim, and thus must dismiss the derivative state-law claims against these defendants as well.  See Pisano, 77 A.3d at 660 (citation omitted).  However, some of the Section 1983 claims against Lackawanna County, D.A. Powell, Chief Jordan, and Detectives Munley, Zech, and Condrad have not been dismissed.  As a result, the derivative claims for wrongful death and survival against these defendants will remain.

D.A. Powell, Chief Jordan, Detectives Munley and Zech, and Lackawanna County also take issue with plaintiff's wrongful death claim in Count VII because it seeks compensatory damages to include "loss of [Gatto's] companionship, comfort, and guidance."  (See Doc. 1 ¶ 324).  Defendants argue that loss-of-consortium claims are limited to spouses in Pennsylvania.  (See Doc. 38 at 34; Doc. 39 at 13).  Defendants are correct that Pennsylvania does not recognize claims for the loss of "filial consortium."  Jackson v. Tastykake, Inc., 648 A.2d 1214, 1217 (Pa. Super. Ct. 1994) (collecting cases).  But defendants incorrectly apply this precedent to the complaint.  Plaintiff does not assert a loss-of-consortium *claim* against defendants; she is requesting a particular type of damages.  Under Pennsylvania's Wrongful Death Act, beneficiaries "may recover not only for medical, funeral, and estate administration expenses they incur, but also for the value of [the decedent's]

services, including society and comfort." <u>Hatwood v. Hosp. of the Univ. of Pa.</u>, 55 A.3d 1229, 1235 (Pa. Super. Ct. 2012) (<u>quoting Rettger v. UPMC Shadyside</u>, 991 A.2d 915, 932-33 (Pa. Super. Ct. 2010)).  We will not dismiss this damages portion of Count VII.[4]

Defendants also seek to dismiss the portion of Kate Gatto's survival claim in Count VIII that seeks damages related to "the loss and deprivation of [Gatto's] normal activities, pursuits, and life pleasures."  (<u>See</u> Doc. 1 ¶ 326).  Plaintiff neither acknowledges nor responds to this argument.  (<u>See generally</u> Doc. 48).  Under Pennsylvania law, loss of life's pleasures are not included in the damages for a survival action.  <u>See</u> <u>Willinger v. Mercy Catholic Med. Ctr.</u>, 393 A.2d 1188, 1191 (Pa. 1978); <u>Broome v. Antlers' Hunting Club</u>, 595 F.2d 921, 923 (3d Cir. 1979) (citing <u>Willinger</u>, 393 A.2d at 1188).  We agree with defendants that loss of life's pleasures is not a recoverable element of damages in a survival action in Pennsylvania, and will strike this request from the complaint.[5]

---

[4] One set of defendants also moves to dismiss the "punitive damages in Court VII" arguing that Pennsylvania does not allow punitive damages in wrongful-death suits.  (<u>See</u> Doc. 38 at 24).  Upon review of the complaint, Count VII for wrongful death does not include a request for punitive damages.  (<u>See</u> Doc. 1 ¶¶ 322-324).  We will deny this portion of the motion as lacking merit.

[5] Lackawanna County briefly argues that the survival action fails to assert a theory of liability to give rise to this claim.  (<u>See</u> Doc. 39 at 14-15).  As plaintiff correctly points out, Count VIII incorporates by reference all previous paragraphs in the complaint.  (<u>See</u> Doc. 1 ¶ 325; Doc. 48 at 38).  We will deny this aspect of Lackawanna County's motion as without merit.

### C.      Motion to Strike

Several defendants, including D.A. Powell, Chief Jordan, and Detectives

Munley and Zech, move to strike certain paragraphs from the complaint, including

paragraphs 3, 253 through 266, 274, and parts of paragraphs 278, 279, and 286.  (See

Doc. 28 ¶¶ 53-65; Doc. 38 at 36-38).

Under Federal Rule of Civil Procedure 12(f), the court may strike from a

pleading "any redundant, immaterial, impertinent, or scandalous matter."  FED. R.

CIV. P. 12(f).  District courts have "considerable discretion" in resolving a Rule 12(f)

motion.  Krisa v. Equitable Life Assurance Soc'y, 109 F. Supp. 2d 316, 319 (M.D. Pa.

2000) (quoting N. Penn. Transfer, Inc. v. Victaulic Co. of Am., 859 F. Supp. 154, 158

(E.D. Pa. 1994)).  In general, such a motion will be denied unless the allegations are

severely prejudicial to one of the parties and unrelated to the plaintiff's claims.  Id.;

see also 5C CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 1382

(3d ed. 2016).  A party is prejudiced when the challenged pleading "confuses the

issues" or places an undue burden on the responding party.  Karpov v. Karpov, 307

F.R.D. 345, 348 (D. Del. 2015).

At the pleading stage, we will not strike paragraphs 3, 253 through 254, 256

through 265, 274, 278, and 279.  Defendants argue Paragraph 3 does not allow them

to defend themselves, yet it contains the exact statutory section under which

plaintiff is asserting a wrongful death action.  (See Doc. 1 ¶ 3).  Paragraphs 253

through 254, 256 through 265, 274, 278, and 279 all relate to the Monell claim and

"failure to train, supervise, and discipline" theories alleged in Count I against

Lackawanna County.  (See id. ¶¶ 253-254, 256-265, 274, 278, 279).  Paragraph 286(h)

refers to "withholding, concealing, fabricating[,] and tampering with evidence" related to Gatto's murder.  (<u>See</u> <u>id.</u> ¶ 286(h)).  Plaintiff responds that she will be seeking a spoliation of evidence instruction at trial.  (<u>See</u> Doc. 48 at 40-41).  We find it premature to consider the merits of such a possible instruction at this juncture and will not strike this subparagraph.

We will grant the motion to the extent it seeks to strike paragraphs 255 and 266.  These paragraphs relate to the Lackawanna County and D.A. Powell's prosecution of Mapson, vaguely refer to the Pennsylvania Crime Victims Act, <u>see</u> 18 PA. CONS. STAT. § 11.101, *et seq.*, and allege that Lackawanna County and D.A. Powell may have violated the statute.  (<u>See</u> Doc. 1 ¶ 266).  However, plaintiff brings no independent claim under this act, nor does she allege how these actions may be related to any of the substantive due process claims contained in the complaint.  We will strike these paragraphs as immaterial.

### D.    Leave to Amend

Courts generally must grant leave to amend before dismissing a civil rights claim if a curative amendment is conceivable.  <u>See</u> <u>Grayson v. Mayview State Hosp.</u>, 293 F.3d 103, 108 (3d Cir. 2002).  Many of the deficiencies identified herein are factual and thus conceivably curable.  Accordingly, we will grant leave to amend consistent with this memorandum.

**IV.** <u>**Conclusion**</u>

We will grant in part and deny in part defendants' motions (Docs. 24, 28, 31, 35) to dismiss.  An appropriate order shall issue.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    September 30, 2021